UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. 08-CR-0121

versus                             JUDGE HICKS

HECTOR BARRAGAN-ESPINO             MAGISTRATE JUDGE HORNSBY

# REPORT AND RECOMMENDATION

## Introduction

Before the court is Defendant's Motion to Suppress. Doc. 20. An evidentiary hearing was held on August 11, 2008. After the hearing, the parties filed supplemental briefs. Docs. 37 & 38. For the reasons that follow, it is recommended that Defendant's motion be denied.

## The Facts

The following facts were established at the evidentiary hearing. On January 29, 2008 at about 2:11 a.m., Trooper George Beck was patrolling I-20 in Bossier Parish. Trooper Beck observed a 1995 Nissan Maxima traveling east on I-20. When Trooper Beck came up behind the Maxima, he believed the vehicle did not have a proper government-issued license plate. Initially, he noticed that the plate on the Maxima did not "glow" when his headlights made contact with it. As he got closer, he saw what he believed was a dealer advertisement plate with a design of an American flag. He also saw that the plate had a tinted cover. Trooper Beck believed the plate was not a proper government-issued plate and that it was

improperly obscured by the tinted plastic cover. He activated his emergency lights to initiate a traffic stop. Defendant, the driver of the Maxima, pulled his vehicle onto the right shoulder of the interstate.

Trooper Beck approached the driver's side door of the Maxima and made contact with Defendant. Defendant identified himself and produced an Arizona drivers license. Trooper Beck advised Defendant about the reasons for the stop. Defendant stated that the plate was a temporary tag (he bought the car in the prior month) and that he had placed the plastic on the plate to protect it from the rain. On close inspection after the stop, Trooper Beck could see that the paper license plate was actually a temporary, government-issued Georgia plate.

Defendant told Trooper Beck that he and his female companion were traveling from Dallas to Atlanta. Defendant then clarified that they were traveling from Phoenix, but they had stopped in Dallas for a few hours to visit his sister (who was not home).

Trooper Beck asked Defendant about his passenger. Defendant stated that she was his girlfriend, but he hesitated when asked for her name. (While Defendant's primary language is Spanish, the video (DVD) of the stop shows that Trooper Beck had no real difficulty communicating with Defendant in English.) Defendant also stated that he did not know the age of his girlfriend.

Trooper Beck approached the passenger and requested identification. She produced a Mexican identification card. The passenger spoke almost no English. She stated that she

and Defendant were traveling from California to Florida, but she did not know where in Florida. Trooper Beck determined that she was an illegal alien. Tr. 51, 54.

Trooper Beck requested the paperwork for the vehicle. He examined the bill of sale and compared the numbers to the numbers on the temporary license tag and to the VIN. The numbers matched.

Because of the inconsistencies in the answers of the Defendant and his passenger, that Defendant did not know how old his girlfriend was, and that Defendant hesitated when asked her name, Trooper Beck believed that criminal activity was afoot. Trooper Beck returned to his patrol car and initiated computer and criminal history checks on Defendant and the passenger. He learned that the Maxima was not stolen and there were no warrants on Defendant or the passenger. However, he learned that Defendant had a criminal history for possession of marijuana for sale, assault with a deadly weapon, illegal entry, and smuggling illegal aliens. Trooper Beck then called his partner, Trooper Michael Dowden, for back-up.

Trooper Beck exited his patrol car and returned Defendant's driver's license and other paperwork to Defendant. Trooper Beck told Defendant that he was not going to take any enforcement action against Defendant. The video of the stop shows that, after Defendant began to turn and walk away (and return to his vehicle), Trooper Beck asked Defendant if he could talk to him. He told Defendant that the police see a lot of illegal activity on the highway, such as smuggling illegal aliens and drugs. (During this discussion, Trooper Beck referenced the passenger as an illegal alien.) Trooper Beck then asked Defendant for consent

to search his vehicle. Defendant readily gave his verbal consent. Trooper Beck then presented Defendant with a Consent to Search Form (Gov. Ex. 1) in Spanish. Defendant read over the form and signed it.

Trooper Beck began searching the car. He found screws missing in the front fender wells. He also noticed that the screws holding the car's front mud flaps were shiny, which indicated fresh tool marks. (The car was otherwise dirty.) He also discovered "Bondo" (a repair material) that was not yet hardened and unmatched paint. He could smell fresh paint. When he tapped on the rocker panel, he did not hear a hollow sound. Trooper Beck believed he had discovered a hidden compartment.

Trooper Beck advised Defendant of his <u>Miranda</u> rights, took Defendant's driver's license, and directed Defendant to follow him to Troop G's headquarters so that a more thorough search of the car could be conducted. At Troop G, Trooper Beck discovered approximately 18 pounds of methamphetamine hidden within the false compartment in the Maxima.

**Defendant's Motion to Suppress**

Defendant's motion argues that the initial traffic stop was made without reasonable suspicion or probable cause of criminal activity. He also argues that Trooper Beck did not have any lawful reason to continue detaining Defendant after ascertaining that Defendant's vehicle had a proper temporary license tag.

**Law Regarding Traffic Stops**

The legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392 U.S. 1 (1968). See Knowles v. Iowa, 525 U.S. 113, 117 (1998); Berkemer v. McCarty, 468 U.S. 420, 439 (1984); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)(en banc). Under the two-part Terry reasonable suspicion inquiry, the court must determine whether the officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20; Brigham, supra at 506-507; U.S. v. Lopez-Moreno, 420 F.3d 420, 429-434 (5th Cir. 2005); United States v. Daniels, 265 Fed.Appx. 219, 221 (5th Cir. 2008).

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100, 102 (5th Cir.1995). In making a reasonable suspicion inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. See, e.g., United States v. Santiago, 310 F.3d 336, 340 (5th Cir.2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from

each other. Arvizu, 534 U.S. at 274. However, it is clear that the officer's mere hunch will not suffice. Terry, 392 U.S. at 27. It is also clear that reasonable suspicion need not rise to the level of probable cause. Arvizu, 534 U.S. at 274.

An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. United States v. Lenz, 162 Fed. Appx. 379, 382 (5th Cir. 2006). Thus, an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment. Scott v. United States, 436 U.S. 128, 138 (1978); Devenpeck v. Alford, 543 U.S. 146, 153 (2004). See also Goodwin v. Johnson, 132 F.3d 162, 173 (5th Cir. 1997) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ....").

As for the second prong of the Terry inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Brigham, 382 F.3d at 507. In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508. Indeed, the

officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510. See also Santiago, 310 F.3d at 341-42; United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000). A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); U.S. v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006).

**Analysis**

The traffic stop was justified at its inception. Defendant's temporary license plate (depicted in Govt. Ex. 2 and Defendant's Exs. 1 & 2) did not appear to be a government issued license plate. Instead, the American flag design caused the plate to resemble a mere decorative plate or an advertisement for a car dealership.

Defendant makes much of the fact that the license plate is visible in the photographs marked as Exhibits D-1 and D-2, both of which appear to have been take with a flash camera

while the car was stationary. Those photographs, especially D-2, do not depict what Trooper Beck saw under the circumstances at the time he saw it. It must be remembered that Trooper Beck first noticed the temporary plate at night while traveling 60-70 m.p.h. on I-20. It was not until Defendant's and Trooper Beck's vehicles were safely stopped on the side of the interstate that Trooper Beck could examine the plate more closely and determine that the plate was, in fact, a valid temporary license plate issued by the state of Georgia. The design of the plate is very unusual. Although a police officer for 13 years, Trooper Beck had never seen this type of temporary license plate before. His initial belief that the plate was not a valid government-issued plate was, under the circumstances, objectively reasonable.

Trooper Beck's belief that the plate was simply a dealer advertisement was caused not only by the unusual American flag design of the plate but also by the light blue tinted plastic that covered the plate. A Louisiana statute, La.R.S. 47:521, requires that a license plate be clearly legible and free from foreign materials. Arguably, the tinted cover on Defendant's temporary license plate violated La.R.S. 47:521 because the plate was not "clearly visible" and "free from foreign materials." See Santiago, 310 F.3d at 341 (*arguable* violation of traffic law justified initial stop, even if it was unlikely defendant could have been convicted of that violation). See also United States v. Fontenot, 2008 WL 2660777 (5th Cir. 2008)(initial stop was justified because officers could not read temporary license plate – which was lying on the rear dashboard – until after the traffic stop; tag was not legible from the rear of the vehicle as required by Texas law); United States v. Daniels, 265 Fed.Appx.

at 221-222 (initial stop was justified because obscured paper registration tag in rear window was not visible as required by Texas law). The fact that Trooper Beck did not issue a citation or that Trooper Beck expressed some understanding of why the plastic cover was used does not change the fact that the initial stop was justified at its inception.

The traffic stop was reasonably related in scope to the circumstances that justified the interference in the first place. Trooper Beck did not unreasonably extend the duration of the traffic stop, even after he determined the temporary license plate was valid. During the questioning of the driver and the passenger, Trooper Beck developed additional reasonable suspicion that other criminal activity was afoot. Defendant hesitated when asked his girlfriend's name. He did not how old she was. Defendant and his passenger gave conflicting stories about their travel plans. Trooper Beck's computer checks showed that Defendant had a criminal history for smuggling illegal aliens, and he determined that the passenger was an illegal alien. Significantly, once the computer checks were completed and it was determined that there were no warrants for Defendant and his passenger, Trooper Beck returned Defendant's driver's license and other paperwork to him. At that point, Defendant was free to go. It was only after Defendant began to turn away to return to his vehicle that Trooper Beck asked for and received consent to search the car.

There is nothing in the video of the traffic stop that suggests that Trooper Beck improperly prolonged the stop to obtain Defendant's consent to search. Instead, the evidence shows that Trooper Beck acted promptly and reasonably to resolve the reasonable suspicion

that emerged during the stop. Accordingly, Trooper Beck's actions were constitutionally permissible under Terry and Brigham.

**Consent to Search**

Defendant does not challenge the voluntariness of his oral and written consents to search the vehicle. Nevertheless, a review of the video shows that Defendant's consent to the search was, in fact, voluntarily given. Defendant was not in custody when he gave his consent; Trooper Beck acted professionally and courteously at all times, and he did not employ any improper or coercive police procedures to obtain Defendant's consent; Defendant was very cooperative; Defendant took a few moments to read over the Spanish Consent to Search Form, which clearly advised Defendant of his right to refuse the search and his right to revoke his consent at any time; and Defendant likely felt certain that the illegal drugs would not be found because the drugs were so well concealed in the hidden compartment. See United States v. Jenkins, 46 F.3d 447, 451-452 (5th Cir.1995)(factors used to assess voluntariness of consent). Considering the totality of the circumstances, Defendant's consent to search the vehicle was given voluntarily and freely.

**Conclusion**

Defendant's traffic stop was proper. Trooper Beck believed that Defendant did not have a proper license plate as required by law. That belief – although mistaken – was objectively reasonable under the circumstances. After the stop was made, Trooper Beck acted promptly to dispel the reasonable suspicion that arose during the stop. Once Trooper

Beck completed his computer checks, Defendant was free to go. Defendant's subsequent consent to the search of his car was freely and voluntarily given.

Accordingly;

**IT IS RECOMMENDED** that Defendant's Motion to Suppress (Doc. 20) be **denied.**

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Cr. P. 59(b)(2). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 23rd day of September, 2008.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE